# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #013

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **17th day of March, 2015**, are as follows:

**PER CURIAM**:

2014-B -2085     IN RE: JAMES A. GRAY II (Disciplinary Counsel)

Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that James A. Gray, II, Louisiana Bar Roll number 6262, be and he hereby is suspended from the practice of law for two years. It is further ordered that respondent shall participate in the Louisiana State Bar Association's Fee Dispute Resolution Program with Frederick Reed and Peggy Small Burns and refund any unearned fees as ordered by the arbitrator. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

SUPREME COURT OF LOUISIANA

NO. 2014-B-2085

IN RE: JAMES A. GRAY, II

ATTORNEY DISCIPLINARY PROCEEDING

PER CURIAM

This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, James A. Gray, II, an attorney licensed to practice law in Louisiana.

**UNDERLYING FACTS**

*The Frith Matter*

Gloria Frith retained respondent in 2004 to handle a medical malpractice claim. When he had failed to take any action in the matter by September 2009, Ms. Frith sent respondent a letter discharging him and requesting that he deliver a complete copy of her file to her new attorney, David L'Hoste. Respondent did not comply with Ms. Frith's request. In October 2009, and again in December 2009, Mr. L'Hoste sent letters to respondent requesting Ms. Frith's file, but respondent still did not provide the file.

In March 2010, Ms. Frith filed a disciplinary complaint against respondent. During a September 1, 2010 sworn statement, respondent testified that he had spoken to Ms. Frith several times regarding her malpractice claim, but he did not take any action in the matter because he was unable to locate an expert who would testify on Ms. Frith's behalf. He stated that he did not provide Ms. Frith and Mr. L'Hoste with the file in response to their letters because he was unable to locate it

at that time. Respondent delivered a copy of the file during the sworn statement; however, the only documents in the file were those which Ms. Frith had provided respondent during the initial consultation.

The ODC alleged that respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.1(a) (failure to provide competent representation to a client), 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.4 (failure to communicate with a client), 1.16(d) (obligations upon termination of the representation), and 8.4(a) (violation of the Rules of Professional Conduct).

### *The Roberts Matter*

In 2003, Barbara Roberts, her siblings, and her father hired respondent to represent them in a claim for the wrongful death of Ms. Roberts' brother while he was an inmate in the St. Tammany Parish Jail. In July 2003, respondent filed a lawsuit on behalf of his clients. On May 5, 2010, the case was dismissed on grounds of abandonment. Respondent did not inform his clients of the dismissal. In fact, one of Ms. Roberts' siblings informed respondent of the dismissal after checking with the court. When he learned of the dismissal, respondent indicated he would file an appeal. However, he never did so.

In November 2010, Ms. Roberts filed a disciplinary complaint against respondent. Respondent received notice of the complaint but failed to respond.

The ODC alleged that respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.1(a), 1.3, 1.4, 1.16(d), 8.1(c) (failure to cooperate with the ODC in its investigation), and 8.4(a).

### *The Reed Matter*

On February 2, 2010, Frederick Reed pleaded guilty to one count of manslaughter and one count of attempted second degree murder. On February 5, 2010, Frederick, in proper person, filed a motion to withdraw his guilty plea. On February 9, 2010, Frederick's father paid respondent $18,750 of a $25,000 fee to represent Frederick with respect to the motion to withdraw his guilty plea, a direct appeal of his sentence, and post-conviction proceedings.

Respondent did not enroll as Frederick's counsel of record, and neither he nor Frederick received notice of a hearing on the motion to withdraw the guilty plea. The record indicates that the judge denied Frederick's motion on February 19, 2010 without a hearing. Neither respondent nor Frederick received notice of the denial of the motion.

In March 2010, respondent visited Frederick at the Union Parish Detention Center. In July 2010, respondent visited Frederick at Elayn Hunt Correctional Facility. When Frederick learned that respondent had not enrolled as his counsel of record, he and respondent decided to terminate the representation. Respondent then refunded $14,000 of the $18,750 that Frederick's father had paid toward the fee.

In December 2010, Frederick filed a disciplinary complaint against respondent, alleging that respondent neglected his legal matter. Frederick also demanded a refund of the remaining funds his father paid. Respondent received notice of the complaint but failed to respond.

The ODC alleged that respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.3, 1.4, 1.5(a) (charging an unreasonable fee), 1.5(b) (the scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable

time after commencing the representation), 1.5(f)(5) (failure to refund an unearned fee), 8.1(c), and 8.4(a).

*The Burns Matter*

In May 2009, Peggy Small Burns hired respondent to represent her in a succession matter. They agreed to a $5,000 fee, and Ms. Burns paid respondent a total of $3,900 over a period of seven months. However, Ms. Burns stopped making payments because she was unable to communicate with respondent about the status of her legal matter. On July 18, 2011, Ms. Burns wrote to respondent to terminate the representation due to his failure to communicate with her. She also requested the return of her file and a refund of the $3,900 she paid.

In July 2011, Ms. Burns filed a disciplinary complaint against respondent. On October 13, 2011, respondent provided the ODC with a sworn statement, during which he presented a copy of Ms. Burns' file. Respondent testified that he would contact Ms. Burns to determine whether she wanted him to continue the representation.

In response to the ODC's inquiry, Ms. Burns confirmed that respondent contacted her about completing the matter, but she indicated that he subsequently failed to take any further action. She also indicated that the file respondent provided contained only documents she submitted to respondent and some of her documents were missing from the file.

The ODC alleged that respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.1(a), 1.3, 1.4, 1.5(a), 1.5(b), 1.5(f)(5), 1.16(d), and 8.4(a).

## DISCIPLINARY PROCEEDINGS

4

In August 2012, the ODC filed formal charges against respondent. Respondent answered the charges, essentially denying any misconduct. The matter then proceeded to a formal hearing on the merits.

*Formal Hearing*

The hearing committee conducted the hearing over the course of three days in the summer of 2013. Both respondent and the ODC introduced documentary evidence and called witnesses to testify before the committee. Respondent also testified on his own behalf and on cross-examination by the ODC.

On the first day of the hearing, respondent filed a motion to dismiss the formal charges in the Burns matter, on the ground that the ODC sent Ms. Burns a letter dated November 9, 2011 dismissing her complaint and she failed to properly appeal the dismissal. In response, the ODC argued that the complaint initially appeared to be a fee dispute and that it dismissed the complaint because respondent promised to enroll in the Louisiana State Bar Association's ("LSBA") Fee Dispute Resolution Program to resolve the issue. When respondent subsequently failed to do so, the ODC reopened the investigation based on Ms. Burns' assertion that respondent failed to return her entire file when he provided the file during his sworn statement. The committee then denied respondent's motion, reasoning that sufficient evidence existed to reopen the investigation, despite not coming from a new formal disciplinary complaint, and the ODC was obligated to proceed.[1]

*Hearing Committee Report*

---

[1] We agree with the committee that it was appropriate for the ODC to reopen the investigation of respondent's misconduct in the Burns matter despite not having received another formal disciplinary complaint (or an appeal of the dismissal of the prior complaint) from Ms. Burns. See Supreme Court Rule XIX, § 11(A) ("[t]he disciplinary counsel shall evaluate all information coming to his or her attention by complaint or from other sources alleging lawyer misconduct or incapacity.").

After considering the evidence and testimony presented at the hearing, the hearing committee made the following factual findings:

The Frith Matter – Ms. Frith and respondent testified regarding this matter. Both testified that Ms. Frith hired respondent in a potential medical malpractice claim on a contingency fee basis in October 2004.

Ms. Frith testified that she contacted respondent by telephone dozens of times and met with him approximately seven times following their initial meeting, and respondent always advised that he was working on her case. These conversations and meetings occurred until September 2009 when she became concerned that such a long period of time had passed with seemingly very little having been done on her case. She checked with the clerk of court's office to see if a lawsuit had been filed on her behalf and learned that none had. Ms. Frith then contacted Mr. L'Hoste for representation. She also testified that at no time did respondent advise her any deadlines had been missed. Instead, he told her everything was fine.

Ms. Frith attempted to get a copy of her file from respondent. On September 4, 2009, she sent respondent a letter, discharging him as her attorney and directing him to deliver a copy of her file to Mr. L'Hoste. Respondent did not respond to Ms. Frith's letter. Therefore, Mr. L'Hoste spoke with respondent directly about getting Ms. Frith's file. Mr. L'Hoste then wrote a letter, dated October 29, 2009, to respondent documenting their conversation. Respondent did not send Ms. Frith's file, so Mr. L'Hoste wrote to him again on December 17, 2009 to request the file. When respondent did not respond to the letter, Ms. Frith filed a disciplinary complaint against him on March 15, 2010.

Respondent did not provide a written response to the complaint until he filed his answer to the formal charges on September 9, 2012. During his September 1, 2010 sworn statement to the ODC, respondent indicated he would provide Ms.

Frith's file to the ODC by September 20, 2010. Respondent did not provide the file until July 12, 2013, which was the second day of the formal hearing in this matter.

The file respondent produced had little to nothing in it. Notably absent from the file were notes of any conversations respondent may have had with any consulting physicians, bills or invoices reflecting payments to consulting physicians, not a single piece of correspondence, rejection letter, or anything to indicate any action by respondent on the file following his initial meeting with Ms. Frith. Instead, the file consisted of documents provided by Ms. Frith and the correspondence from Mr. L'Hoste.

Respondent testified that he met with and communicated with Ms. Frith repeatedly concerning her case. Respondent testified that he informed her that he had not been able to find a physician to support the case and he was therefore unable to file for her. His testimony was in stark contrast to Ms. Frith's testimony and her recollection of his repeated assurances that he was working on her case.

Respondent further testified that it is his practice to get a doctor's support for a medical malpractice claim before filing the claim. While this is a good practice, in this instance, the claim was referred to respondent by Ms. Frith's eye doctor. Presumably such a referral comes with it an implicit sense on the referring doctor's part that the claim may have merit. If respondent evaluated Ms. Frith's claim and elected not to pursue it, he should have terminated the representation in a clear and explicit manner at a time that would have allowed Ms. Frith to seek other counsel or file her claim pro se. The evidence and testimony presented at the hearing indicated that respondent took no such steps.

The committee found Ms. Frith's testimony to be credible and found respondent's testimony not credible. Based on the above findings, the committee

determined that respondent violated the Rules of Professional Conduct as charged. Additionally, the committee determined that respondent violated Rule 8.1(c).

The Roberts Matter – Barbara Roberts' two sisters, Jennifer Roberts and Cheryl Woods, testified regarding this matter. Respondent also testified. Each of the witnesses testified that respondent was hired in May 2003 to represent the family regarding a claim for the wrongful death of Frank Anthony Dawson while in custody at the St. Tammany Parish Jail. Present at the initial meeting with respondent were Barbara, Jennifer, Cheryl, and Connie Dawson, who were Frank's sisters. Additionally, Frank's father, Frank Winston, Sr., was also present at the meeting.

Respondent testified he knew at the outset that a potential conflict existed between the four sisters and the father in that the father's claims would preclude the claims of the four sisters. Respondent stated that he discussed the conflict with the family but did not obtain a written waiver of the conflict as required. The committee determined that respondent's testimony indicated a violation of Rule 1.7(b) (conflict of interest: current clients) of the Rules of Professional Conduct.

Respondent filed a petition for damages on behalf of all five family members. Shortly thereafter, an exception was filed to dismiss the claims of the four sisters. Respondent explained that, in order to have the father removed as the proper party to assert the claim, he had the father execute an affidavit stating "that his relationship with his son was limited during the son's childhood." Respondent told the family that he thought they would be better off if the sisters, instead of the father, had the claim. Respondent had hoped the trial court would "kick the daddy out" and leave the sisters as the proper parties to present the claim. Respondent acknowledged the difficult position he was entering into with the affidavit, claiming that he "didn't want to damage the daddy too badly, but he's still in the case, because then you had zero for everyone." Cheryl indicated respondent kept

8

telling her about "Exhibit E," which provided that, if a parent did nothing for the child, the parent got nothing. The committee presumed she was referencing paragraph (E) of La. Civ. Code art. 2315.1 and/or art. 2315.2, which provides that "[f]or purposes of this article, a father or mother who has abandoned the deceased during his minority is deemed not to have survived him."

Jennifer testified that, in approximately August 2004, a hearing was scheduled in the case. She and her sisters met respondent in the courthouse parking lot before the hearing. After a brief conversation, respondent went into the courthouse ahead of them. When they went inside, they were unable to find respondent. Jennifer called respondent when they went outside again, and he informed her that he was already on his way back to his office. Cheryl recalled that, while they talked to respondent in the parking lot, he told them he would meet them in the courtroom. When they went inside, respondent was nowhere to be found. Respondent confirmed the meeting in the parking lot with the sisters before he went into the courthouse. He also confirmed leaving the courthouse without speaking to them and receiving a call from them on his way back to New Orleans.

On May 4, 2010, the defendant filed a motion to dismiss the case due to abandonment. The basis for the motion was that, on March 26, 2007, the defendant had propounded discovery to the plaintiffs but received no response. The order of dismissal was signed on May 5, 2010. Respondent testified that he continued to work on the case between 2007 and the 2010 dismissal but had not filed anything into the record. He also did not have anything in his file with which to oppose the motion. Cheryl testified that the family met with respondent several times between 2007 and September 2009. They also had telephone conversations on January 31, 2008 and November 12, 2008. Cheryl indicated that during each meeting and telephone call, respondent told them he was working on the case. Jennifer testified that she became curious following conversations with respondent

9

and checked the court records to see what was going on in the case. In doing so, she discovered the case had been dismissed. Respondent testified that he learned of the dismissal from the family and subsequently confirmed same. Jennifer testified that, during a telephone conversation in which Cheryl also participated, respondent explained to them he was going to appeal the dismissal because he should have had five years before abandonment due to Hurricane Katrina. Jennifer never received another telephone call from respondent following this conversation. Cheryl also testified that she, as well as the rest of her family, did not have further contact with respondent thereafter. Respondent testified that, when he began to research the abandonment issue, he realized the five-year provision had been temporary and had expired. Therefore, he had no basis for an opposition to the dismissal. He admitted that he did not communicate this discovery to the family.

Cheryl and respondent also testified about attempts to get from the defendant a videotape showing the events giving rise to the wrongful death claim. Cheryl testified that the videotape was an important element in discovering what had happened to her brother. She also testified that respondent had informed her he was having difficulty obtaining a copy of the videotape from the defendant but that he was working on it. Respondent similarly testified that the videotape was an important piece of evidence and that the defendant was fighting him on turning it over. Despite respondent's testimony, he produced no evidence to support his contention that he was working on getting the videotape. No subpoena was issued to the defendant. Additionally, although respondent propounded discovery requests to the defendant, there was no evidence to indicate he filed a motion to compel the discovery of the videotape. The record also lacked evidence to support the claims of respondent's efforts to obtain the videotape. Thus, the evidence presented indicated a lack of diligence by respondent.

10

Regarding the charge of respondent's failure to cooperate with the ODC's investigation of this matter, the evidence presented at the hearing indicated that respondent did not respond to the initial disciplinary complaint, despite receiving notice. Rather, respondent's only response to the complaint came in his answer to the formal charges filed on September 9, 2012, nearly two years after he received notice of the complaint.

The committee found the testimony of Jennifer and Cheryl to be credible and found respondent's testimony not credible. Based on the above findings, the committee determined that respondent violated Rules 1.1(a), 1.3, 1.4, 1.7(b), 8.1(c), and 8.4(a) of the Rules of Professional Conduct. The committee found no violation of Rule 1.16(d) because respondent had already allowed the claim to prescribe before the termination of the representation.

The Reed Matter – Frederick's father, Frederick Douglas Reed, and respondent testified regarding this matter. Mr. Reed, a retired healthcare executive, testified that, sometime between February 3, 2010 and February 8, 2010, he contacted respondent about representing Frederick, who had just entered a guilty plea only to subsequently file a pro se motion to withdraw the plea. He explained that he needed an attorney to represent Frederick regarding the motion as well as any subsequent appeal, should it be necessary. Mr. Reed met with respondent, who informed him that he required $25,000 to represent Frederick. On February 8, 2010, Mr. Reed asked respondent if $18,750 would be sufficient to retain him. Respondent agreed, and the two planned to meet the next day at the courthouse. Mr. Reed testified that he paid respondent with a cashier's check and expected to receive a contract. Respondent told him he would mail the contract, but Mr. Reed never received one. Mr. Reed also expected respondent to enroll as Frederick's counsel on the day they met at the courthouse because respondent told him he was going upstairs to do so. Mr. Reed indicated that he talked to

11

respondent once a week for a month to get updates on Frederick's case. Thereafter, he was unable to get in touch with respondent directly. Both respondent and respondent's employees consistently told Mr. Reed that the judge had not yet ruled on Frederick's motion. In August 2010, Mr. Reed was able to speak with respondent directly, and respondent told him that he was going to file a pleading, which Mr. Reed assumed was an appeal, in Frederick's case the next morning. In response to this conversation, Mr. Reed went to respondent's office to obtain a copy of the pleading. On arrival, however, respondent told Mr. Reed that he was no longer going to represent Frederick. Mr. Reed further testified that at no time during the representation did he or Frederick receive any correspondence from respondent. Mr. Reed claimed that respondent's inaction resulted in delays in Frederick's case, including his son being incarcerated for more than two years without having received another trial. After hiring another attorney to represent Frederick, Mr. Reed learned that the judge had denied his son's motion to withdraw the guilty plea on February 19, 2010. He also learned that respondent had never enrolled as Frederick's counsel of record.

Respondent testified that Mr. Reed hired him to represent his son. He understood the scope of the representation to include both the hearing on the motion to withdraw the guilty plea as well as any subsequent appeal that might be necessary. Respondent admitted that he never enrolled as Frederick's counsel. His rationale for not enrolling as counsel was because he did not want his enrollment to cause a disruption in notice of the hearing date as he expected the matter to be heard very soon after he was hired. He also claimed that it was customary for criminal defense attorneys to appear at a hearing for their clients and enroll on the record before the court without the need for a formal process or filing. However, respondent never made an appearance in open court on Frederick's behalf so as to make such an enrollment for him. Respondent expected to receive notice of the

hearing date from Frederick as he expected the court to directly notify Frederick of the hearing date before the judge ruled on the motion. Instead of officially enrolling as Frederick's counsel, respondent indicated that he went to the judge's chambers on the day Mr. Reed hired him and advised the judge's staff that he was representing Frederick. He asked the judge's staff if a hearing date had been set on the motion to withdraw the guilty plea and was told the hearing date had not been scheduled. From that date on, respondent or his office staff would call the judge's chambers periodically requesting information concerning the status of the motion. He testified that the judge's staff never informed him the motion had been scheduled for hearing or had been ruled on.

Respondent further indicated that, after he was terminated as Frederick's counsel, he offered to return the entire fee paid but Mr. Reed suggested respondent keep a portion of the fee for the work he had done on the case, including the two trips to visit Frederick in jail. Respondent explained that he did not have any cost sheets, expense notes, or mileage reimbursement sheets in Frederick's file because he probably was not going to charge for any of those expenses. He acknowledged that he kept $4,000 of the funds originally tendered by Mr. Reed and never sent an accounting to the Reeds after the relationship ended. Mr. Reed testified that he and respondent discussed a return of the fee and acknowledged he was willing to pay whatever he owed respondent. However, he also testified that it was respondent's job to give him an itemized list of charges. He indicated that such a list from respondent would have been sufficient for him.

Regarding the disciplinary complaint, respondent acknowledged receiving same and acknowledged that Frederick had requested a full refund. Nevertheless, respondent indicated he did not provide a full refund and did not take any steps to resolve the fee dispute.

The committee found Mr. Reed's testimony to be credible and found respondent's testimony not credible. Based on the above findings, the committee determined that respondent violated Rules 1.3, 1.4, 1.5(a), 1.5(b), 1.5(f)(5), 8.1(c), and 8.4(a) of the Rules of Professional Conduct.

The Burns Matter – Ms. Burns and respondent testified regarding this matter. Ms. Burns and respondent agreed that respondent was hired in May 2009 for representation regarding the succession. They also both testified that the fee was $5,000 with Ms. Burns making monthly payments of $500 until paid. Ms. Burns paid a total of $3,900 before she stopped making payments. The record does not contain a retainer agreement. An engagement letter outlining the scope and purpose of the representation was not included in the evidence.

Ms. Burns testified that she hired respondent to represent her in long-standing litigation of a succession she was handling and to assist her in being put into possession of a piece of real property included within the succession, as well as recovery of payments she had personally made to maintain the property and pay taxes on the property. Following their initial meeting, Ms. Burns appeared in court with respondent and other counsel involved in the long-standing case. At that time, the judge held an in-chambers conference with the counsel involved. When respondent came out of the conference, he advised Ms. Burns that the attorneys were going to try to settle the matter. Thereafter, sometime in 2010, Ms. Burns requested a status update from respondent but never heard back from him. In June and July 2011, she wrote to respondent, discharging him as her attorney and requesting a full refund of the $3,900. In her correspondence to respondent, Ms. Burns included detailed log sheets listing various dates on which she tried to contact respondent without success. After she filed a disciplinary complaint against respondent, Ms. Burns advised the ODC she no longer wished to pursue the complaint in exchange for a refund of her fee. The ODC relayed the information

to respondent via letter dated February 3, 2012 and advised respondent the ODC was prepared to close the complaint upon receipt of proof of his enrollment in the LSBA's Fee Dispute Resolution Program. Respondent indicated he would contact the LSBA.

Respondent testified he had done what he could for Ms. Burns during the representation, including most importantly keeping her as the executor of the succession. He further testified that, although he was aware Ms. Burns wanted to be put into possession of the property, in his mind there was no way to do so as she did not have the resources to pay the other heirs for their portion of the estate without selling the property. It was not made clear to the committee whether respondent ever communicated this belief to Ms. Burns. In fact, as with the previous matters, respondent's file in the Burns matter contained no correspondence to his client. Rather, respondent's file consisted of his motion to enroll and a pair of motions to continue and reset a status conference. The record presented at the hearing was devoid of any correspondence to Ms. Burns concerning the status of her matter, respondent's efforts and/or difficulties attempting to resolve the matter, or any responses from respondent to several letters sent by Ms. Burns concerning her inability to contact him and her request for the return of fees. There was also no evidence or correspondence presented that respondent had taken any action to enroll in the Fee Dispute Resolution Program.

Despite Ms. Burns' several letters to respondent requesting he return her file, he never did. The only copy of her file she received was from the ODC. Ms. Burns further testified that the copy she received from the ODC did not contain the full contents of the materials she had provided to respondent. It was missing the receipts for property taxes and materials she had bought to keep the property in

good repair. She further testified that, despite her requests for a refund, respondent never refunded her money and never gave her an accounting.

The committee found Ms. Burns' testimony to be credible and found respondent's testimony not credible. Based on the above findings, the committee determined that respondent violated Rules 1.1(a), 1.3, 1.4, 1.5(a), 1.5(b), 1.5(f)(5), 1.16(d), and 8.4(a) of the Rules of Professional Conduct.

The committee further determined that respondent's files in these matters showed a lack of adequate recordkeeping, a lack of diligence, and a lack of any legal work having been performed on the matters, with the exception of respondent's actions in the Roberts matter to remedy the questionable original petition he filed. Furthermore, respondent's inaction and/or refusal to produce client files to both his clients and the ODC constitute violations of the Rules of Professional Conduct. Even the committee called for the production of respondent's client files, most particularly the Reed file. Despite the formal hearing taking place over the course of three separate days (the third day for the purpose of receiving the missing file), the Reed file materials were not produced until mid-morning on the third day and only after the committee took a recess for respondent to have someone from his office immediately hand carry the file to the committee.

The committee also noted that no mitigating evidence, other than a statement by respondent's counsel that none of the clients suffered actual harm, was introduced. The committee, however, disagreed with respondent's counsel and found each client suffered actual harm as a result of respondent's inaction. In aggravation, the committee found the following factors: a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct (respondent insisted he acted appropriately in the handling of these matters with the exception of admitting he allowed the Roberts matter to abandon), vulnerability

16

of the victims (with the exception of Mr. Reed who had some level of legal sophistication), and substantial experience in the practice of law (admitted 1973).

After further considering this court's prior jurisprudence addressing similar misconduct, the committee recommended respondent be either disbarred or, at a minimum, be suspended from the practice of law for three years. The committee also recommended respondent be required to address any outstanding fee issues and make restitution.

Respondent objected to the hearing committee's report and recommendation, arguing that the recommended sanction was too harsh. Respondent also argued that the matter should be remanded for a hearing on mitigation because, during the first hearing, he chose not to elicit evidence in mitigation but, instead, chose to limit the hearing to eliciting the facts surrounding the alleged misconduct. Respondent then claimed the following as mitigating factors: 1) his legal career has spanned 40 years, during which he has been a law professor, a trial lawyer in both civil and criminal law, and a trusted advisor to numerous civic and nonprofit organizations; 2) the absence of a prior disciplinary record; 3) no allegations of dishonesty or commingling; 4) thousands of people have been well-served by him; 5) numerous incidents attesting to the fact that he has been a credit to the legal profession; and 6) personal and professional disruptions during the period of alleged misconduct, which contributed to his inability to maintain his historic levels of professionalism.

*Disciplinary Board Recommendation*

After review, the disciplinary board determined the hearing committee's factual findings were supported by the record and were not manifestly erroneous. The board also determined the committee correctly applied the Rules of Professional Conduct, with one exception relating to the Roberts matter. In that

matter, the committee found a violation of Rule 1.7(b). The board, however, noted that the formal charges did not allege a Rule 1.7(b) violation. As such, the board declined to adopt the committee's finding of that rule violation.

The board then determined respondent knowingly violated duties owed to his clients and the legal profession and caused harm to those clients. After considering the ABA's *Standards for Imposing Lawyer Sanctions*, the board determined that the baseline sanction is suspension.

In aggravation, the board found a prior disciplinary record (a 2009 admonition for violating Rules 1.3 and 1.4 of the Rules of Professional Conduct), a pattern of misconduct, multiple offenses, bad faith obstruction of the disciplinary proceeding by repeatedly failing to submit his files to the committee after its repeated requests that he do so, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victims, substantial experience in the practice of law, and indifference to making restitution. The board found that the record does not support any mitigating factors.

Turning to the issue of an appropriate sanction, the board found guidance from the cases of *In re: Gold*, 10-2450 (La. 3/15/11), 59 So. 3d 396, and *In re: Lewis*, 08-2293 (La. 1/21/09), 1 So. 3d 444. In *Gold*, the attorney neglected a legal matter, allowing his client's claim to prescribe, failed to communicate with another client, failed to refund unearned fees to two clients, and failed to cooperate with the ODC in an investigation. The attorney had a prior disciplinary record in addition to other aggravating factors but also had numerous mitigating factors. Accordingly, the court suspended the attorney from the practice of law for two years, with all but six months deferred, followed by two years of unsupervised probation. In *Lewis*, the attorney neglected three separate legal matters, failed to communicate with his clients, failed to account for funds received from the clients or on their behalf, failed to properly withdraw from the cases upon relocating out

of state, and failed to cooperate with the ODC in its investigation. The attorney had a prior disciplinary record in addition to other aggravating factors but no mitigating factors. Accordingly, the court suspended the attorney from the practice of law for two years with no time deferred.

In light of the case law and the lack of mitigating factors present in this matter, the board recommended respondent be suspended from the practice of law for two years. The board also recommended respondent submit to fee arbitration through the LSBA and return any portion of the fee to Mr. Reed and Ms. Burns as ordered by the arbitrator.

Respondent filed an objection to the disciplinary board's recommendation.[2] Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

## DISCUSSION

Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. *In re: Banks*, 09-1212 (La. 10/2/09), 18 So. 3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. *See In re: Caulfield*, 96-1401 (La. 11/25/96), 683 So. 2d 714; *In re: Pardue*, 93-2865 (La. 3/11/94), 633 So. 2d 150.

---

[2] Respondent also requested that this matter be remanded for a hearing on mitigation, suggesting that he made a strategic decision during the formal hearing to focus on eliciting facts surrounding the alleged misconduct and chose not to elicit evidence in mitigation. Respondent's request is denied, as there is no provision in Supreme Court Rule XIX for a bifurcated hearing.

The record indicates that respondent neglected the legal matters of his clients Gloria Frith, Barbara Roberts, Frederick Reed, and Peggy Burns. He also failed to communicate with these clients, despite their numerous and repeated requests for information concerning the status of their cases. Respondent failed to return his clients' files upon request, and failed to refund unearned fees to Mr. Reed and Ms. Burns. Finally, after disciplinary complaints were lodged against him, respondent failed to respond to the complaints and failed to cooperate with the ODC in its investigations. The record supports the rule violations as found by the hearing committee and modified by the disciplinary board.

Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent's actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. *Louisiana State Bar Ass'n v. Reis*, 513 So. 2d 1173 (La. 1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. *Louisiana State Bar Ass'n v. Whittington*, 459 So. 2d 520 (La. 1984).

We find that respondent knowingly violated duties owed to his clients and the legal profession. He caused actual harm to his clients, and his failure to cooperate in the disciplinary investigations harmed the legal profession by forcing the ODC to unnecessarily expend its limited resources trying to sufficiently investigate these matters. The applicable baseline sanction in this matter is suspension.

Aggravating factors present include a prior disciplinary record, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victims, substantial experience in the practice of law,

and indifference to making restitution. An examination of the record reveals no mitigating factors.

In light of the aggravating factors, the lack of any mitigating factors, and the case law presented by the board, we will accept the disciplinary board's recommendation and suspend respondent from the practice of law for two years. We further order respondent to participate in the LSBA's Fee Dispute Resolution Program with Mr. Reed and Ms. Burns and refund any unearned fees as ordered by the arbitrator.

**DECREE**

Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that James A. Gray, II, Louisiana Bar Roll number 6262, be and he hereby is suspended from the practice of law for two years. It is further ordered that respondent shall participate in the Louisiana State Bar Association's Fee Dispute Resolution Program with Frederick Reed and Peggy Small Burns and refund any unearned fees as ordered by the arbitrator. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

21